### Jimmy W. FREEMAN

v.

### SICKNESS AND ACCIDENT DISABILITY PLAN OF AT & T TECHNOLOGIES, INC., and Network Systems/Technology Systems Employees' Benefit Committee of AT & T Technologies, Inc.

### Civ. A. No. H89–0106(W).

United States District Court,
S.D. Mississippi,
Hattiesburg Division.

April 20, 1993.

---

Samuel L. Begley, Jackson, MS, for plaintiff.

William T. Siler, Jr., Jackson, MS, for defendants.

## MEMORANDUM OPINION AND ORDER

WINGATE, District Judge.

In this lawsuit filed pursuant to the Employment Retirement Income Security Act (ERISA) 29 U.S.C. § 1001 *et seq.*, plaintiff, a

former employee of AT & T and a participant in its sickness and accident disability plan, seeks to recover plan benefits thus far denied to him by the defendants. Contending that the medical condition of his left wrist affects his ability to work, plaintiff says he is permanently disabled and, thus, entitled to plan benefits. Defendants contest plaintiff's assertions and maintain that their decision to deny plaintiff benefits under the plan was justified and should be affirmed by the court. Persuaded by the facts and the applicable law, this court favors defendants' position and, hence, finds for the defendants for the reasons which follow.

## THE PARTIES

The plaintiff, Jimmy W. Freeman, is an adult resident citizen of Hattiesburg, Mississippi, who is a participant and a beneficiary as defined at Title 29 U.S.C. § 1002(7) & (8),[1] of the Sickness and Accident Disability Benefit Plan of AT & T Technologies, Inc. Defendant Sickness and Accident Disability Benefit Plan of AT & T Technologies, Inc., (the Plan), is an "employee welfare benefit plan" as that term is defined at Title 29 U.S.C. § 1002(1).[2] Defendant Network Systems/Technology Systems Employees' Benefit Committee of AT & T Technologies, Inc., and AT & T Technologies, Inc., are both fiduciaries having authority to control and

1. Title 29 U.S.C. § 1002(7) & (8) provide:
 (7) The term "participant" means any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees if such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.
 (8) The term "beneficiary" means a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder.

2. Title 29 U.S.C. § 1002(1) defines an employee welfare benefit plan or "welfare plan" as:
 (1) Any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medi-

manage the Plan pursuant to Title 29 U.S.C. § 1102(1) & (2).[3] Though often referred to in this Memorandum Opinion and Order, the Southern Area Employee Benefits Committee (SAEBC) is not a party in this lawsuit. The SAEBC is an Area Benefit Committee appointed by the Network Systems/Technology Systems Employees' Benefit Committee of AT & T Technologies, Inc., (The Committee). The SAEBC's authority to grant or deny claims and make disbursements in accordance with the Plan is delegated to it by The Committee.

## JURISDICTION

Plaintiff brings this civil enforcement action pursuant to Title 29 U.S.C. § 1132(a)(1)(B) and § 1132(e)(1) of the Employee Retirement Income Security Act (ERISA). Section 1132(a)(1)(B), Title 29 U.S.C., provides:

A civil action may be brought—

(1) by a participant or a beneficiary—

(B) to recover benefits due him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

Title 29 U.S.C. § 1132(e)(1) is the predicate for the court's jurisdiction over this matter. It provides:

cal, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death, unemployment or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services . . . .

3. Title 29 U.S.C. § 1102(1) & (2) provides:
 (1) Every employee benefit plan shall be established and maintained pursuant to a written instrument. Such instrument shall provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan.
 (2) For purposes of this subchapter, the term "named fiduciary" means a fiduciary who is named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary (A) by a person who is an employer or employee organization with respect to the plan or (B) by such an employer and such an employee organization acting jointly.

(1) Except for actions under subsection (a)(1)(B) of this section, the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by the Secretary or a participant. State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under subsection (a)(1)(B) of this section.

## HISTORY OF THE CASE

The pertinent chronology of this case, reflected in the findings of SAEBC,[4] is set out as follows. Plaintiff, an installer with AT & T for many years, allegedly suffered injury to his left wrist while pulling power cable on April 9, 1984. The injury was reported and the plaintiff was examined by Dr. Bruce M. McCarthy on April 11, 1984. Supposedly, that same wrist had been fractured off the job several years prior to the April 9, 1984, re-injury. When plaintiff's injured wrist did not heal, plaintiff submitted to surgery, performed by Dr. McCarthy, on May 31, 1984. After the surgery, plaintiff remained at home under Dr. McCarthy's care. During this period plaintiff received Accident Disability Benefits under the Sickness and Accident Disability Benefit Plan of AT & T Technologies, Inc., (the Plan).

On October 10, 1984, Dr. McCarthy reported to AT & T that the plaintiff could return to light one-handed duty, but not to his regular work as an installer. No work was available and the plaintiff remained at home. Plaintiff continued to receive Accident Disability Benefits under the Plan for the period of a year. Dr. McCarthy continued to examine the plaintiff. After a one-year recovery period, Dr. McCarthy found that the plaintiff could return to work with limited use of his left hand. Dr. McCarthy also gave the plaintiff a 15% disability rating.

Meanwhile, on account of a nationwide reorganization, AT & T Technologies began cutting back personnel in Mississippi and transferring employees to locations where work was available. Plaintiff was selected for transfer to New York, but transfer could not take place while plaintiff's medical condition was in limbo. So, in order to determine plaintiff's physical condition prior to any suggested transfer, AT & T directed one of its physicians, a Dr. Karol Oster, to visit the plaintiff at home, to examine the injured wrist, and determine whether plaintiff was fit for duty. Dr. Oster carried out his assignment and opined that plaintiff was medically competent for duty, so long as plaintiff did not have to exert any repetitive motions with his left hand or wrist. This medical opinion was consistent with that of Dr. McCarthy's, who had performed the surgery on plaintiff's wrist.

Plaintiff reported back to work on or about June 1, 1985. Convinced that plaintiff was fit enough to work, AT & T transferred plaintiff to New York, then gave him an expense paid trip to New York to investigate his new job site. Plaintiff accepted the gratuity, but returned to Mississippi from the New York trip claiming that there was no work he could perform at the New York job site. On June 13, 1985, plaintiff filed a grievance through his labor union, the Communication Workers of America, claiming that he should not be required to transfer to New York due to his need for additional medical attention. Plaintiff sought to remain on disability. On June 28, 1985, plaintiff filed a second grievance with his labor union wherein plaintiff sought to cancel his transfer to New York, or be assigned work locally, or be placed on permanent disability. (*See* Grievance Record of Local No. 10490 attached to the plaintiff's claim for disability benefits, exhibit "b").[5]

Then, on June 30, 1985, plaintiff submitted his resignation, in lieu of permanent transfer.

---

4. SAEBC's "agenda item", which is part of collective exhibit "B" to the affidavit of L.J. Holt Secretary of the Committee, contains plaintiff's "Claim for Accident Benefits", as well as other evidence the Committee received in considering plaintiff's claim and the SAEBC's findings relative thereto.

5. According to findings of the Southern Area Employee Benefits Committee (SAEBC) pertaining to the plaintiff's claimed for permanent disability benefits, these grievances were denied by the plaintiff's labor union all the way to the national level and were referred to arbitration. This arbitration was resolved in favor of AT & T Technologies in September of 1989.

408

In a letter written by the plaintiff to a Mr. Thompson with AT & T Technologies, the plaintiff stated that he was resigning due to his physical condition. The plaintiff also said that he was resigning "under protest" because he did not want to be transferred to New York. Plaintiff's resignation was accepted. He was paid separation pay in the amount of $28,560.00 and Workers Compensation in the amount of $3,360.00.

Then, on August 16, 1985, the plaintiff retained an attorney and applied for additional medical treatment and temporary total disability through Workers Compensation. Plaintiff then requested that the Plan permit him to change his treating physician from Dr. McCarthy to a Dr. Robert Zarzour, an orthopedist in Mobile, Alabama. This request was denied. Nevertheless, on September 15, 1985, the plaintiff elected to have Dr. Zarzour perform fusion surgery on his wrist. Dr. McCarthy had refused plaintiff's earlier requests to perform this same surgery because he believed such surgery had doubtful benefits. Since the Plan had denied plaintiff's request to change his treating physician, the Plan refused to pay for the surgery performed by Dr. Zarzour. The Plan also refused to pay benefits for plaintiff's unapproved consultation on November 24, 1986, with a psychologist. Between April of 1987 and May of 1988, plaintiff was embroiled in his Workers Compensation dispute.[6] An accord was reached whereby the plaintiff agreed to settle his Workers Compensation claim if he be permitted to file a claim for Accident Disability Benefits with the SAEBC. On May 25, 1988, the Workers Compensation claim was settled for $16,-419.10. Then, on May 26, 1988, after receiving instructions on how to file a proper claim, plaintiff filed this claim for disability to the SAEBC. This claim was denied[7] on August 23, 1988. The SAEBC gave these reasons for its decision:

Employee was found able to return to work with restrictions by his treating physician, Dr. McCarthy, on 5/30/85. The Company[8] Medical Organization agreed employee was able to work with his restriction, and New York Installation advised they had work available within his restriction. Mr. Freeman was notified he was being placed on the active roll effective 5/30/85 and would be given 30 days for housing search in the New York area. Mr. Freeman visited New York and was assured by line management that work was available within his restriction. On 6/30/85 employee resigned in lieu of permanent transfer to New York.

Employee allegedly became disabled on 9/15/85 after his resignation when he voluntarily underwent a second surgical procedure on his left wrist. The surgery, which was performed by Dr. Zarzour, an orthopedist in Mobile, Ala., was not deemed necessary by the treating orthopedist, Dr. McCarthy, nor authorized by the Company. Therefore, employee's claim does not meet the criteria of Section 5, Paragraphs 1, 5 and 7 of the Sickness and Accident Disability Benefit Plan quoted below:

### Section 5, Paragraph 1

"All employees shall be participants in the Accident Disability Benefit Plan and qualified to receive payments under these Regulations on account of physical disability to work by reason of accidental injuries ... arising out of and in the course of employment ..."

### Section 5, Paragraph 5

"Accidental injuries shall be considered as arising out of and in the course of employment only where the injury was resulted solely from accident during and in direct connection with the performance of the duties to which the employee is assigned to the service of the company ..., and there must be a clear and well established histo-

6. See the SAEBC's findings on plaintiff's claim for disability benefits, pages 4–5.

7. According to the SAEBC findings, arbitration of any pending labor grievances was postponed pending the outcome of this benefit claim.

8. The "Company" is AT & T Technologies.

ry of the cause and circumstances of injury accidentally inflicted, and they must be sufficient to produce the alleged injury, and there must be satisfactory evidence that such injury renders the employee unable to perform his duty in the service of the Company."

*Section 5, Paragraph 7*

"In case of accidental injury to any employee arising out of and in the course of employment by the Company, ..., the Company will pay for the necessary surgical treatment, but no employee shall have authority to contract any bills against the Company or the Committee and nothing herein shall be held to mean or imply that the Company will be responsible for such bills as an employee may contract or his surgeon may charge.... The decision as to whether in any case surgical treatment was necessary and as to what constitutes surgical treatment shall rest with the Committee...."

The SAEBC found that the plaintiff's on-the-job injury did not render the plaintiff unable to perform his duty to AT & T Technologies, the Company. The SAEBC also found that work was available with the Company prior to the plaintiff's resignation which took into consideration the plaintiff's work restriction. The SAEBC further found that the plaintiff became disabled only after undergoing the unauthorized fusion surgery performed on plaintiff's left wrist by Dr. Zarzour. Hence, reasoned the SAEBC, plaintiff's disability was not the result of an on-the-job injury. The plaintiff appealed the SAEBC decision to the Network Systems/Technology Systems Employees' Benefit Committee (the Committee).

On January 17, 1989, the Committee upheld the SAEBC's denial of plaintiff's claim. Afterwards, plaintiff filed this cause of action

pursuant to Title 29 U.S.C. § 1132(a)(1)(B) on June 19, 1989.

## ASPECTS OF THE PLAN

The AT & T Technologies, Inc., Sickness And Accident Disability Benefit Plan (the Plan), effective January 1, 1984, is administered by an Employee Benefits Committee appointed by AT & T Technologies. The Employment Benefits Committee appoints Area Benefit Committees such as the SAEBC. The Area Benefit Committees, pursuant to the authority delegated to them, grant or deny claims for benefits under the Plan and authorize disbursements according to the terms of the Plan. Any participant whose claim has been denied in whole or in part may submit a written request for review by the Employee Benefits Committee within sixty (60) days and shall have the rights of review as are provided in section 503 of ERISA, 29 U.S.C. § 1133.[9]

■ Although the text of ERISA does not expressly mention the exhaustion doctrine, it is well established that federal courts have the authority to require exhaustion of remedies in suits arising under ERISA. *See Simmons v. Willcox*, 911 F.2d 1077, 1081 (5th Cir.1990); *Meza v. General Battery Corp.*, 908 F.2d 1262, 1279 (5th Cir.1990); *Denton v. First National Bank of Waco, Texas*, 765 F.2d 1295, 1301 (5th Cir.1985). Therefore, once a participant's claim for benefits has been denied by the Employee Benefits Committee, a cause of action arises under Title 29 U.S.C. § 1132. The participant may then pursue a civil action in federal district court to recover the benefits denied by the Plan. *See* 29 U.S.C. § 1132(a)(1)(B).

## THE ARBITRARY AND CAPRICIOUS STANDARD

After a period of discovery, defendants moved for summary judgment pursuant to

---

**9.** Title 29 U.S.C. § 1133 provides:

In accordance with regulations of the Secretary, every employee benefit plan shall—

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

Rule 56(b),[10] Federal Rules of Civil Procedure, seeking affirmance of the Committee's determination to deny benefits to plaintiff. Plaintiff responded with his own motion for summary judgment, asserting that he was entitled under ERISA to a *de novo* hearing. Defendants opposed the argument, convinced instead that the applicable ERISA jurisprudence allowed plaintiff a review only under the arbitrary and capricious standard. Of course, between these two standards yawns a great measure of difference. Under the *de novo* standard, the court would hear the matter for a second time in the same manner as the matter was originally heard by the plan administrator, while under the arbitrary and capricious standard courts review the plan administrator's findings for any abuse of discretion.

Initially, this court determined that this matter should be reviewed according to the arbitrary and capricious standard. The court relied on the language of the United States Supreme Court in the case of *Firestone Tire and Rubber Company v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), to wit:

> . . . Consistent with established principles of trust law, we hold that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

*Id.*, 489 U.S. at 115, 109 S.Ct. at 957. In *Firestone Tire and Rubber Company v. Bruch*, the United States Supreme Court dealt with a termination pay plan which contained no language which granted the administrator of the Plan the power to construe uncertain terms or which provided that the eligibility determinations of the administrator were entitled to deference. Therefore, finding no language granting discretionary authority in the provisions of the termination pay plan, the Supreme Court in *Bruch* held

that the administrator's decision should be reviewed pursuant to the *de novo* standard.

In the case *sub judice*, this court determined that the language of the Plan was sufficient to bestow discretionary authority. The court found the Plan to provide that the company, AT & T Technologies, Inc., shall appoint an Employees' Benefit Committee (Section 3.1). The Committee is granted the powers necessary in order to enable it to administer the Plan (Section 3.2(a)). The Committee is granted the power to appoint Area Benefit Committees, such as the SAEBC, which are authorized to grant or deny claims (Section 3.2(e)). Any participant is permitted a full and fair review of any decision to deny a claim by an Area Benefit Committee. This review, conducted by the Employee Benefit Committee, constitutes a conclusive determination of all questions arising from administration of the Plan (Section 3(c)(4). Hence, these provisions persuaded this court that the parties had agreed to a narrower standard of review. The Supreme Court has observed that "neither general principles of trust law nor a concern for impartial decision making, . . ., forecloses parties from agreeing upon a narrower standard of review." *Firestone Tire and Rubber Company v. Bruch*, at 115, 109 S.Ct. at 956. So, by its order entered October 6, 1990, this court adopted the arbitrary and capricious standard of review. The parties were then directed to submit briefs summarizing their arguments on the remaining issues.

## CONFLICT–OF–INTEREST AND ITS IMPACT ON THE ARBITRARY AND CAPRICIOUS STANDARD

However, the plaintiff again raised the issue of the standard of review to be applied in this case, pointing to a circumstance not highlighted when this court earlier determined that the arbitrary and capricious standard should be employed. According to plaintiff, there exists a conflict of interest between the Committee's role as a fiduciary of the Plan and AT & T Technologies' profit

---

**10.** Rule 56(b) of the Federal Rules of Civil Procedure provides:

 **(b) For Defending Party.** A party against whom a claim, counterclaim or cross-claim is

asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.

motive. Citing *Cargile v. Confederation Life Insurance Group Plans*, 748 F.Supp. 874 (N.D.Ga.1990), and *Brown v. Blue Cross & Blue Shield of Alabama, Inc.*, 898 F.2d 1556 (11th Cir.1990), *cert. denied*, 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991), plaintiff contended that any inherent conflict, between the fiduciary role of the Committee and the profit-making objective of AT & T Technologies would make a highly deferential standard of review inappropriate. *See Newell v. Prudential Insurance Company of America*, 904 F.2d 644, 651 (11th Cir.1990), (following *Brown*).

Having heard the plaintiff's argument, the court reviewed the submitted authority and other cases involving the standard of review when conflict-of-interest is asserted against a plan administrator. In *Brown v. Blue Cross & Blue Shield of Alabama, Inc.*, the plaintiff's employer established an ERISA plan under which Blue Cross provided insurance coverage to the employer for a monthly premium. This was an insurance policy plan, meaning that the plan's sole asset consisted of the insurance policy issued by Blue Cross rather than an actual trust fund. Blue Cross paid all claims out of its own assets and suffered the losses, if any, just as does AT & T in the case *sub judice*. Blue Cross also made all eligibility determinations, just as does the Employment Benefit Committee appointed and paid for by AT & T in the case *sub judice*. Based on these considerations, the *Brown* Court found that Blue Cross's fiduciary role was in perpetual conflict with its profit-making role. *Id.* at pages 1561–62. According to the Court, the inherent conflict between the fiduciary role and the profit-making objective made a highly deferential standard of review such as the arbitrary and capricious standard inappropriate. *See Newell v. Prudential Insurance Company of America, supra.* The above observations caused the Eleventh Circuit in *Brown* to develop a "modified arbitrary and capricious" standard of review for ERISA cases involving questions of conflict-of-interest, a standard very similar to an "abuse of discretion" review. *Id.* at 651.

In *Cargile v. Confederation Life Insurance Group Plans, supra*, the Northern District of

Georgia found, just as the court found in the case *sub judice*, that the decision of the arbitrator should be reviewed in accordance with the arbitrary and capricious standard rather than the *de novo* standard inasmuch as the terms of the plan in question gave the plan administrator broad discretion to make benefits determinations. However, the plan administrator was also the company vice-president and head of personnel; benefits came from a company group insurance plan, not a separate trust. So, reasoned the district court, the plan administrator's decision could not be given the deference normally associated with the arbitrary and capricious standard in view of a possible conflict of interest arising from the company's payment of benefits from its own assets. The defendant's motion for summary judgment was denied because, according to the district court, a genuine issue of material fact existed regarding the ability of the plan administrator to purge himself of the self-interest surrounding payment of benefits. The district court cited *Firestone Tire and Rubber Company v. Bruch*, 489 U.S. at 115, 109 S.Ct. at 957, noting that:

> ... [i]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a "factor in determining whether there is an abuse of discretion." (citation omitted).

748 F.Supp. at 877.

Then, there is the case of *Jett v. Blue Cross & Blue Shield of Alabama*, 890 F.2d 1137 (11th Cir.1989), where the employer of the claimant reimbursed the plan administrator, Blue Cross, for the payment of benefits it made as the plan administrator. The *Jett* Court held that Blue Cross's decisions regarding eligibility for benefits were entitled to deference because Blue Cross was not paying claims with its own assets, and there was no conflict.

Educated by the foregoing authority, this court concluded that the case *sub judice* is more like the circumstances in *Brown, Cargile* and *Newell* than those in *Jett*. The court specifically found that the Committee in this case is the plan administrator who undertakes to pay definite amounts to its

employees for expenses caused by sickness or injury. All benefits authorized under the Plan are charged to the operating expense accounts of AT & T Technologies; so, benefits are paid from AT & T Technologies' assets. (*See* the SICKNESS AND ACCIDENT DISABILITY BENEFIT PLAN at pages 1–15). The Committee also appoints the members of the Employment Benefits Committee who determine eligibility questions. The Committee pays the expenses of committee meetings and hearings. Therefore, finding extensive involvement in the Plan by AT & T Technologies, this court granted plaintiff's request for a conflict-of-interest hearing.

## THE "MODIFIED VERSION" OF THE ARBITRARY AND CAPRICIOUS STANDARD

In *Brown v. Blue Cross & Blue Shield of Alabama*, the Eleventh Circuit set out to apply the arbitrary and capricious standard in a manner that took self-interest into account. The Court stated:

> Our task is to develop a coherent method for integrating factors such as self-interest into the legal standard for reviewing benefits determinations. This task reaches the height of difficulty in a case such as the one before us, where an insurance company serves as the decision making fiduciary for benefits that are paid out of the insurance company's assets.

898 F.2d at 1561. Although the case *sub judice* does not involve an insurance company acting as the decisionmaking fiduciary, the decisionmaking fiduciary, in this case the Employees' Benefit Committee of AT & T Technologies, Inc., pays benefits from its own assets, thereby laying the same predicate for this court's review as was faced by the Court in *Brown v. Blue Cross & Blue Shield of Alabama*.

The *Brown* Court stated that *de novo* review is an attractive avenue for controlling the exercise of discretion contrary to the interests of beneficiaries. However, opined the Court, the application of this strict standard would deny a plan administrator such as Blue Cross the benefit of the review bargain it made in the insurance contract. Citing *Firestone Tire & Rubber Company v. Bruch*, the *Brown* Court noted that the United States Supreme Court firmly endorsed the ability of parties to agree upon a narrower standard of review. *Brown v. Blue Cross & Blue Shield of Alabama*, at 1563. "At the same time," said the *Brown* Court, "we must control the tension between contractual standards of review and an interpretation of ERISA that 'would afford less protection to employees and their beneficiaries than they enjoyed before ERISA was enacted.'" *Id.*, at 1563.

The *Brown* Court warned against the temptation to follow precedent set by administrative agency decisions when the arbitrary and capricious standard is being employed in ERISA cases. In some instances, said the Court, the overlap between the two is evident. However, the Court expressed caution at wholesale importation of administrative agency concepts into review of ERISA fiduciary decisions:

> ... We express caution, however, at wholesale importation of administrative agency concepts into the review of ERISA fiduciary decisions. Use of the administrative agency analogy may, ironically, give too much deference to ERISA fiduciaries. Decisions in the ERISA context involve the interpretation of contractual entitlements; they "are not discretionary in the sense, familiar from administrative law, of decisions that make policy under a broad grant of delegated powers." (citation omitted). Moreover, the individuals who occupy the position of ERISA fiduciaries are less well-insulated from outside pressures than are decisionmakers at government agencies.

*Brown v. Blue Cross and Blue Shield of Alabama*, at 1564 n. 7.

Citing Comment *d* to section 187 of the *Restatement (Second) of Trusts*,[11] the *Brown* Court listed six factors the courts may con-

---

11. The United States Supreme Court named this source in *Firestone Tire and Rubber Company v. Bruch* for evaluating abuse of discretion.

sult in order to determine whether a trustee is guilty of an abuse of discretion:

(1) the extent of discretion conferred upon the trustee by the terms of the trust;

(2) the purposes of the trust;

(3) the nature of the power;

(4) the existence or nonexistence, the definiteness or indefiniteness, of an external standard by which the reasonableness of the trustee's conduct can be judged;

(5) the motives of the trustee in exercising the power;

(6) the existence or nonexistence of an interest in the trustee conflicting with that of the beneficiaries.

*Brown v. Blue Cross & Blue Shield of Alabama,* at 1564.

As in the case *sub judice,* the *Brown* Court was dealing with a fiduciary/plan administrator that paid benefits from its own assets. The Court found in this circumstance that factors five and six were the most significant for the purpose of evaluating the ERISA fiduciary's actions. Starting with the sixth factor, conflict-of-interest, the Court cited the Fifth Circuit trust case of *Fulton National Bank v. Tate,* 363 F.2d 562, 571–72 (5th Cir.1966), quoting as follows:

[T]he beneficiary need only show that the fiduciary allowed himself to be placed in a position where his personal interest *might* conflict with the interest of the beneficiary. It is unnecessary to show that the fiduciary succumbed to this temptation, that he acted in bad faith, that he gained an advantage, fair or unfair, that the beneficiary was harmed. Indeed, the law presumes that the fiduciary acted disloyally, and inquiry into such matters is foreclosed. The rule is not intended to benefit the beneficiary for any loss he may have sustained or to deprive the fiduciary of any unjust enrichment. Its sole purpose and effect is prophylactic. . . .

*Brown v. Blue Cross & Blue Shield of Alabama,* at 1565. "In other words," said the *Brown* Court, "one reason for limiting the deference when the fiduciary suffers a conflict of interest is to discourage arrangements where a conflict arises." *Id.*

The *Brown* Court found that conflict-of-interest touches upon the fifth factor, motive of the trustee, as well. Citing Comment *g* to section 187 of the *Restatement (Second) of Trusts,* the Court quoted the following:

Although ordinarily the court will not inquire into the motives of the trustee, yet if it is shown that his motives were improper or that he could have acted from a proper motive, the court will interpose. In the determination of the question whether the trustee in the exercise of a power is acting from an improper motive the fact that the trustee has an interest conflicting with that of the beneficiary is to be considered.

*Brown v. Blue Cross & Blue Shield of Alabama,* at 1565. "The rationale for this approach," said the *Brown* Court, "is clear." "A conflicted fiduciary may favor, consciously or unconsciously, its interests over the interests of the plan fiduciaries. (citation omitted). The judicial hesitation to inquire into the fiduciary's motives will leave the beneficiaries unprotected unless the existence of a substantial conflict of interest shifts the burden to the fiduciary to demonstrate that its decision is not infected with self-interest." *Brown v. Blue Cross & Blue Shield of Alabama,* at 1565, citing *Fulton National Bank v. Tate,* at 571.

### DID CONFLICT–OF–INTEREST INFECT DEFENDANTS' DECISION?

As stated earlier, the court granted the plaintiff's request for a hearing on the matter of conflict-of-interest. The purpose of the hearing was to consider whether the Committee's decision was motivated by a conflict of interest, namely, whether plaintiff was detrimented by any profit motive of AT & T Technologies. As stated by the Eleventh Circuit in *Brown v. Blue Cross & Blue Shield of Alabama, supra,* "[a] finding of conflict of interest has tremendous impact on the evaluation of the fiduciary's actions." *Id.,* at 1565. However, before concluding that a plan administrator's decision is arbitrary and capricious, the court must also determine whether there is a reasonable basis for the decision based on the facts known at the time. *Brown v. Blue Cross & Blue Shield of Alabama, supra,* at page 1559;

*Blank v. Bethlehem Steel Corporation*, 926 F.2d 1090 (11th Cir.1991).

 Where the plaintiff has made a substantial showing of conflict of interest, the burden of proof shifts to the defendant to show that its denial of benefits was not infected by self-interest. *Brown v. Blue Cross & Blue Shield of Alabama*, at pages 1566–68; *Newell v. Prudential Insurance Company of America*, at page 651. To phrase it differently, a defendant's decision to deny plaintiff benefits will be found to be arbitrary and capricious if the decision advances the conflicting interest of AT & T Technologies at the plaintiff's expense, unless defendant can justify the decision on the ground that the decision benefits all plan beneficiaries. *Brown v. Blue Cross & Blue Shield of Alabama, Inc., supra*, at pages 1566–67.

The court has reviewed the evidence upon which the Committee based its decision to uphold the denial of the plaintiff's claim by the SAEBC. As mentioned above, the court has before it collective exhibit "b" to the affidavit of L.J. Holt, Secretary of the Committee. One document, styled "Claim for Accident Benefits," contains the findings of the SAEBC and the affirmance of the SAEBC's findings by the Committee. The Committee considered the documents contained in this exhibit when it reviewed the SAEBC's decision. Also presented to the court is a transcript of the plaintiff's arbitration hearing conducted on his behalf by his union, Communication Workers of America, and AT & T Technologies. The arbitration hearing was conducted on September 12, 1989, approximately nine months after the Committee upheld the SAEBC's denial of plaintiff's claim for benefits under the Plan. Although the Committee did not rely on the testimony contained in the arbitration hearing transcript, the document has been submitted to this court for consideration.

The SAEBC findings include the chronological account of the plaintiff's case referred to earlier in this opinion. The SAEBC found the plaintiff was an installer with AT & T for many years and that he suffered injury to his left wrist while pulling power cable on April 9, 1984. The SAEBC found that while plaintiff was recovering, AT & T began cutting back positions in Mississippi and transferring employees to locations where work was available. Plaintiff was selected for transfer to New York. However, this transfer could not take place while plaintiff was on sick leave recovering from his injury. The SAEBC's findings refer to the medical examinations of the plaintiff after his one-year recovery period by Dr. Karol Oster, and the report of plaintiff's treating physician, Dr. McCarthy, stating that plaintiff could return to work with limited use of the left hand.

The SAEBC found that AT & T Technologies management in New York had work available which took into consideration the plaintiff's work restriction of limited use of his left hand and wrist. The transcript of plaintiff's arbitration hearing submitted to the court includes the sworn testimony of Nicholas Bonaimo, an installer supervisor with AT & T Technologies in New York, who said that plaintiff would not have done "grunt" work if he had transferred to the New York work site. Instead, said Bonaimo, the plaintiff would have done work directing other installers, laying out jobs, specification assurance, etc.; Bonaimo suggested that the New York work site needed plaintiff's experience as an installer rather than his performance as an installer. According to Bonaimo, this plan of action was made clear to the plaintiff.

The SAEBC found that the plaintiff had discussed his claim for disability benefits with the Plan's authorized benefit delegate on August 1, 1985. The SAEBC noted the delegate's comment that, in his opinion, the claim was not so much about disability benefits as it was about plaintiff's grievance over being transferred.

The Committee also had a June 12, 1986, letter to AT & T from plaintiff's treating physician, Dr. McCarthy, saying that plaintiff was ten months past the wrist fusion operation performed by Doctor Zarzour. Dr. McCarthy said the plaintiff was hostile because Dr. McCarthy did not recommend this operation. Furthermore, according to Dr. McCarthy's letter, plaintiff claimed to be doing much better because of the fusion surgery, an admission the SAEBC may have

considered to be significant in their final analysis of plaintiff's claim.

Also reviewed by the SAEBC was a March 17, 1988, letter written to AT & T Technologies in Hattiesburg by its attorney in Jackson, Mississippi, concerning Dr. McCarthy's deposition. The letter quotes Dr. McCarthy's deposition testimony that plaintiff's problems arose with the divestiture and break-up of the Bell system, and the relocation of employees. Counsel's letter refers to Dr. McCarthy's statement that plaintiff has an old injury to his left hand and probably had been suffering with his condition for a long time prior to the cable pulling injury in question. Counsel's letter concluded with Dr. McCarthy's estimation that perhaps 80% of plaintiff's problem is caused by his pre-existing fracture while only 20% is the product of the cable pulling injury. Finally, the SAEBC concluded that the plaintiff's onset of disability occurred after the performance of unauthorized fusion surgery to plaintiff's wrist. On January 17, 1989, the Committee considered all of the above relative to the plaintiff's administrative appeal and sustained SAEBC's denial of plaintiff's claim for benefits.

█ This court has reviewed the record and exhibits submitted and concludes that defendants' decision, based upon the evidence before it at the time, was reasonable. The SAEBC and the Committee reasonably concluded that plaintiff had a pre-existing injury; that plaintiff's onset of disability occurred after plaintiff opted for unauthorized surgery; that plaintiff could have returned to work; that plaintiff's decision not to do so was primarily motivated by his repugnance to a transfer to New York; and that aggrieved over the transfer, plaintiff chose to resign. Additionally, defendants have shown that they almost never deny a claim for benefits. According to the defendants, 6000 of 6012 claims filed against the Plan since this matter has been before the court have been granted. Plaintiff has evidenced no quarrel with these figures. On balancing all of the evidence, then, the court is convinced that defendants' decision was influenced by the above matters of concern instead of by any motives of profit.

## THE MATTER OF COMMITTEE'S ALLEGED FAILURE TO CONSIDER RELEVANT EVIDENCE

Lastly, the plaintiff charges that the Committee failed to consider the results of his favorable Social Security Administration disability determination, which found that plaintiff was entitled to disability benefits for a period commencing May 1, 1984, and ceasing on January 30, 1986. Defendants reply that it was incumbent upon the plaintiff to present his disability determination to the SAEBC for its consideration. Plaintiff did not do so; therefore, say defendants, the matter is now immaterial.

The court has found no Fifth Circuit authority on point. However, in *Pokratz v. Jones Dairy Farm*, 771 F.2d 206 (7th Cir. 1985), the plaintiff formally sought benefits from his employer's plan after he had become legally blind. He also sought disability benefits through the Social Security disability system. The employer's plan offered benefits for total disability only. The plan sent plaintiff to rehabilitation and determined he was able to work; so, benefits were denied. Moreover, a psychiatrist concluded that the plaintiff could work if he was motivated to do so. The plaintiff had worked for 20 years with his employer. All the while his eyesight had grown steadily worse. The psychiatrist found the plaintiff to be uncooperative and unmotivated at times, but not unable to work in capacities similar to his past employment such as packager, orchard worker or kitchen helper. Based on these findings, the plan denied benefits. Meanwhile, the Social Security Administration found the plaintiff to be disabled.

The Seventh Circuit had no problem with the conflicting conclusions of the plan's decision maker and the Social Security Administration with regard to the plaintiff's claim of disability, noting that this discrepancy did not suggest arbitrariness which was important for judicial review. Instead, said the Seventh Circuit, "[w]hen it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Pok-*

*ratz v. Jones Dairy Farm, supra*, at page 209. The Seventh Circuit stated:

> The "arbitrary or capricious" standard calls for less searching inquiry than the "substantial evidence" standard that applies to the Social Security disability cases. Although it is an overstatement to say that a decision is not arbitrary or capricious whenever a court can review the reasons stated for the decision without a loud guffaw, it is not much of an overstatement. The arbitrary or capricious standard is the least demanding form of judicial review of administrative action. Any questions of judgment are left to the agency, or here to the administrator of the plan.

*Pokratz v. Jones Dairy Farm, supra*, at page 209.

The *Pokratz* Court, then, mindful of the variant standards involved, saw no problem with the conflict between the Social Security Administration's findings and those of the plan administrator, so long as the plan administrator had a well reasoned explanation for his findings.

■■■ In the case *sub judice*, the court finds that the plan administrator reached a well reasoned conclusion based upon the evidence before it at the time plaintiff's claim was being considered. That the Social Security Administration reached another conclusion, under another standard does not mean that the decision of the plan administrator here was incorrect or ill-considered under the standard which here applies. Therefore, the court finds that the failure of the Committee to consider the finding of the Social Security Administration was not erroneous, especially when the finding was never presented for the Committee's consideration. *See Block v. Pitney Bowes, Inc.*, 952 F.2d 1450, 1455–56 (D.C.Cir.1992), holding that the decision of an employee benefit plan administrator was not arbitrary merely because it conflicted with the findings of the Social Security Administration, especially when the Social Security Administration's decision was based on evidence never presented to the employee benefit plan administrator.

In view of the foregoing, the court finds the motion for summary judgment submitted by the defendants seeking affirmation of the Committee's denial of plaintiff's claim for benefits to be well taken and the same is hereby granted.

SO ORDERED.